IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 4:09CR3019 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | FINDINGS, RECOMMENDATIONS |
| | ) | AND ORDERS |
| CLARENCE D. HERGERT, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant Clarence D. Hergert, ("Hergert"), is charged with eighteen counts of committing bank fraud in violation of 18 U.S.C. § 1344. Filing No. 1. The indictment alleges Hergert knowingly and fraudulently overstated the extent of collateral held by Hergert Milling, Inc., ("Hergert Milling"), a corporation owned and operated by Hergert, to obtain funds on revolving loan from First National Bank of Omaha, ("FNBO"), a financial institution insured by the Federal Deposit Insurance Corporation, ("FDIC").

The defendant has filed the following motions, all of which are now fully briefed:

Filing No. 46        Motion for Bill of Particulars;

Filing No. 48        Motion to Dismiss Criminal Case;

Filing No. 50        Motion to Dismiss Criminal Case or, in the Alternative to Consolidate Counts on the Grounds of Multiplicity;

Filing No. 52        Motion to Change Venue and Vicinage in North Platte;

Filing No. 59        Motion to Suppress; and

Filing No. 61        Motion for Hearing Under Franks v. Delaware.

For the reasons discussed below, the undersigned magistrate judge recommends denial of defendant's motions to suppress, (filing nos. 59 and 61), and for dismissal, (filing nos. 48 and 50), denies defendant's motion for bill of particulars,  (filing no. 46), and grants his motion for change of trial location, (filing no. 52).


**Motion to Suppress**
(Filing No. 59)

On May 25, 2007, United States Magistrate Judge David L. Piester issued warrants to search the following locations:

206 Adams Street, Morrill, Nebraska: the primary business operations office of Hergert Milling, Inc., (see case no. 4:07-mj-03018-DLP); and

1424 Avenue B Scottsbluff, Nebraska:  the principal business office for Hergert Milling, Inc. and Hergert Grain, Inc., (see case no. 4:07-mj-03019-DLP).

Filing No. 62, pp. 4, 22, Attachment A.


The warrants authorized federal agents to search and seize the following documents, property, and information for the time period from January 2000 to the date of the search (May 30, 2007):

1)      Any and all accounts receivables reports to include individual customers as well as customer totals for current and aged accounts receivables concerning Hergert Milling, Inc.

2)      Any and all invoices, purchase orders, or other billing documentation, checks, correspondence and customer files that were submitted to and/or received from any and all customers concerning Hergert Milling, Inc.

3)      Any and all bank statements that were submitted and/or not submitted to and or received from First National Bank of Omaha and/or any other financial institution concerning Hergert Milling, Inc.

-2-

4)      Any and all Borrowing Base Certificates submitted and or not/submitted to First National Bank of Omaha and/or any other financial institution conducting business with Hergert Milling, Inc.

5)      Any and all Evaluation Reports listing Hergert Milling Inc. inventory to include but not limited to grain and any other inventory.

6)      Any and all accounts payable or accounts receivable records concerning Hergert Milling, Inc.

7)      Any and all outstanding checks concerning Hergert Milling, Inc.

8)      Any and all telephone records for Hergert Milling, Inc.

9)      Any and all correspondence between Hergert Milling, Inc., and/or C. David Hergert and the First National Bank of Omaha.

9)[sic]  A complete search of all computer/electronic equipment to include any computer(s), including internal hard disk drive(s), floppy diskettes, compact disks, scanners, printers, other computer/electronic hardware or software and related manuals, and any other electronic storage devices, including but not limited to, personal digital assistants, cellular telephones and electronic pagers for the purpose of finding documents and items listed in Paragraphs 1-9 above.

Filing No. 62, pp. 5, 23, Attachment B.

In support of his warrant request, the affiant officer, United States Secret Service Special Agent Kevin W. Archer, ("Special Agent Archer") asserted Hergert Milling was "engaged in a scheme to submit materially false documents to FNBO for the purpose of defrauding FNBO of loan proceeds in violation of Title 18, United States Code, Section 1014 and 1344.   Filing No. 62, pp. 20, 38, ¶ 24.   Special Agent Archer's warrant application stated as follows:

FNBO is a banking institution insured by the FDIC.  Filing No. 62, pp. 9, 27, ¶ 5.  Defendant Hergert is the president and Nancy Hergert is the secretary of Hergert Milling and Hergert Grain, Inc., both of which are Nebraska corporations.  Filing No. 62, pp. 9, 27, ¶ 6.

Hergert Milling first obtained a revolving credit loan from FNBO on September 30, 1995, and a new loan with FNBO on January 31, 2000, (filing no. 62, pp. 9, 27, ¶ 7), which was amended eleven times between January 31, 2000, and October 31, 2004.  Filing No. 62, pp. 10, 28, ¶ 10.  On December 15, 2004, FNBO and Hergert Milling entered into a Restated Loan agreement, which was amended six times between December 15, 2004, and October 31, 2006.  Defendant Hergert and Nancy J. Hergert were  guarantors on the loans. Filing No. 62, pp. 10-12, 28-30, ¶¶  11, 14.

Under the terms of the 1995 Loan, the 2000 Loan (including its amendments), and the 2004 Restated Loan, Hergert Milling could borrow money at its request, but the total credit extended could not exceed the "Total Borrowing Base," defined as the lesser of:

- $3 million dollars, or

- The aggregate of the following:
    (I)     seventy five percent (75%) of Total Eligible Accounts
            Receivable (less than 60 days from invoice date);
    (ii)    eighty percent (80%) of Grain Inventory; and
    (iii)   fifty percent (50%) of Other Inventory.

Filing No. 62, pp. 9-10, 27-28, ¶¶ 8, 12.  Amendments to the 2004 Restated Loan Agreement lowered the borrowing maximum from $3 million to $1.8 million.  Filing No. 62, pp. 11, 29, ¶ 14.

Under its loan agreements, and for the purposes of determining the availability of remaining credit on its loans from FNBO, Hergert Milling was required to provide FNBO with a Borrowing Base Certificate ("BBC"). In the BBC, Hergert Milling was required to provide a monthly report certifying its:

-- Eligible Accounts Receivable: defined to include all accounts receivable minus Intercompany Receivables and amounts remaining unpaid 61 days or more after being invoiced ("Ineligible Accounts"); and

-- Grain Inventory.

The credit available to Hergert Milling on the FNBO revolving loan was determined, in part, by combining 75% of the reported Eligible Accounts Receivable and 80% of the reported Grain Inventory. As a result, Hergert Milling was able to manipulate the credit available on its FNBO loans by increasing the reported Total Accounts Receivable, decreasing the reported amount of Ineligible Accounts, and/or increasing the reported grain inventory. Filing No. 62, pp. 12-30, ¶ 15.

On February 25, 2006, FNBO collateral examiners discovered material discrepancies in Hergert Milling's reports for Ineligible Accounts and Total Accounts Receivable, including significant discrepancies concerning accounts receivable belonging to Floyd Engleman, a customer of Hergert Milling. Filing No. 62, pp. 12-13, 30-31, ¶¶ 16-17. At FNBO's request, Hergert Milling disclosed to the FNBO collateral examiners its accounts receivable records for the Engleman account for the February 28, 2001 to November 30, 2005 time period, and its total accounts receivable for all customers for the

-5-

month of November 2005. The collateral examiners, in turn, disclosed those records to Special Agent Archer.  Filing No. 62, pp.  13, 31, ¶ 17.

The Secret Service reviewed the Hergert Milling's information and records supplied by the FNBO collateral examiners.  Filing No. 62, pp. 13-14, 31-32, ¶¶ 18, 18.  The records revealed defendant Hergert, as president of Hergert Milling, "manually re-aged" accounts receivable and used this re-aged data to calculate accounts receivable when completing its BBC reports to FNBO.  Specifically, accounts remaining unpaid more than sixty days after being invoiced, and therefore to be subtracted as Ineligible Accounts when calculating the Total Eligible Accounts Receivable, were changed to indicate they were not sixty days post-invoice.  For example, based on the records reviewed by the Secret Service, comparing the reported Ineligible Accounts Receivable for all customers as set forth in the monthly BBC reports to Hergert Milling's records for the Floyd Engleman account alone, Hergert Milling used manual re-aging to under-report ineligible accounts receivable as follows:

| BBC Report Date: | Under-Reported Ineligible Amounts |
|---|---|
| February 28, 2001 | $63,891.79 |
| April 30, 2001 | $45,630.68 |
| May 31, 2001 | $96,434.17 |
| June 30, 2001 | $101,555.07 |
| July 31, 2001 | $719,156.81 |
| October 31,2001 | $117,130.50 |
| December 10, 2001 | $142,240.17 |
| May 31, 2002 | $178,007.11 |
| June 30, 2003 | $390,127.53 |

| | |
|---|---|
| January, 2005 | $263,948.55 |
| February, 2005 | $139,418.23 |
| March, 2005 | $180,076.04 |
| April, 2005 | $186,405.37 |
| May, 2005 | $207,694.26 |
| June, 2005 | $258,676.59 |
| July, 2005 | $434,166.44 |
| August, 2005 | $420,577.68 |
| September, 2005 | $359,569.01 |
| October, 2005 | $177,943.45 |

Filing No. 62, pp. 13-17, 31-35, ¶¶ 18-19.

Hergert Milling's lead accountant, Samantha Valentine, told the FNBO collateral examiners she manually re-aged the Engleman accounts at the direction of defendant Hergert. She explained that Engleman had died, and Hergert Milling was awaiting payment from his estate. Defendant Hergert told the collateral examiners Engleman died in August of 2004, but he actually died in August of 2003. Filing No. 62, pp. 18, 36, ¶ 21.

Hergert Milling had disclosed to FNBO its November 2005 accounts receivable records for all customers. Filing No. 62, pp. 13, 31, ¶ 17. Although the BBC submitted by Hergert Milling to FNBO on December 31, 2005 reported $240,404.41 of accounts receivable aged past 60 days, the customer business records revealed $1,143,819.17 in accounts receivables aged past 60 days, indicating a total under-reporting of Ineligible Accounts Receivable of $903,414. 76. Using the numbers reported on the BBC, Hergert Milling had

-7-

a Borrowing Base Availability of $1,046,773.71.  Using the information obtained from the Secret Service's review of the business records, Hergert Milling's actual Borrowing Base Availability was $369,137.62, and for the month of November 2005, Hergert Milling's loan balance exceeded its Total Borrowing Base Availability.  Filing No. 62, pp. 17-18, 35-16, ¶ 20.

During a second collateral examination performed on December 13, 2006, FNBO collateral examiners discovered Hergert Milling had materially inflated its reported grain inventory.  The October 31,2006 and December 13, 2006 BBCs listed 3,839 tons of chicory in storage for all locations, but on physical examination by the collateral examiners, the chicory inventory totaled only 1,953 tons, approximately 49% less than reported on Hergert Milling's monthly BBC.  Filing No. 62, pp. 18, 36, ¶ 22.

Special Agent Archer interviewed FNBO Collateral Examiner Mick Kozisek on May 23,2007.  Kozisek stated that as of March 21,2007:

--      Samantha Valentine's office was located in Hergert Milling's operation office in Morrill, Nebraska;

--      The majority of all hard copies related to accounts receivable records, including inventory, ticket receipts and financial statements were in the Morrill, Nebraska office;

--      The accounts payable records were in Hergert Milling's Scottsbluff office;

--      Electronic copies of accounting records (including accounts receivable) were maintained on a computer network accessible from several workstations in both the Morrill and Scottsbluff offices of Hergert Milling; and

-8-

--     Loan documents and correspondence between FNBO and Hergert Milling use the Scottsbluff address of Hergert Milling as the main office.

Filing No. 62, pp. 19, 37, ¶ 23.

Magistrate Judge Piester issued the search warrants as requested on May 25, 2007, and the searches were conducted on May 30, 2007.  Filing No. 62, pp. 39-49.  Defendant Hergert claims: 1) there was no probable cause to issue the warrants, and it was unreasonable for the Secret Service Agents to rely on a warrant lacking any indicia of probable cause; 2) the warrant application did not identify, by name, the "FNBO Examiners" who reported "material" discrepancies in Hergert Milling's BBC reports or the basis for concluding these examiners were credible sources of information; 3) the warrants were overbroad as to time and lacked sufficient particularity in describing the property to be searched.

A.     <u>Probable Cause</u>.

A judicial officer presented with a warrant application must consider the "totality of the circumstances" to determine if probable cause exists to justify issuing a search warrant. Illinois v. Gates, 462 U.S. 213, 230 (1983).  "After a judge has issued a search warrant upon a finding of probable cause, 'that finding deserves great deference.' "  U.S. v. Proell, 485 F.3d 427, 430 (8th Cir. 2007)(quoting Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998)).  "Probable cause to issue a search warrant exists when an affidavit [or testimony] in support of the warrant sets forth sufficient facts to establish that there is a 'fair probability that contraband or evidence of' criminal activity will be found in the particular place to be searched."  Proell, 485 F.3d at 430 (quoting United States v. Davis, 471 F.3d 938, 946 (8th Cir. 2006)(quoting Gates, 462 U.S. at 238)).  The determination of probable cause is a "practical, common-sense decision" to be made upon consideration of all the circumstances

set forth in the warrant application.  Gates, 462 U.S. at 238 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)); United States v. Horn, 187 F.3d 781, 786 (8th Cir. 1999)(quoting Gates, 462 U.S. at 238)).

Based on the statements in the warrant applications, Secret Service agents reviewed Hergert Milling's business documents for the Engleman Farms accounts, and for November 2005 as to all customers, and found significant discrepancies (e.g., more than $900,000 in under-reporting for November 2005) in the reported amount of Ineligible Accounts Receivables in BBCs signed and submitted by defendant Hergert to an FDIC-insured financial institution.  The agents also reviewed the loan documents, which revealed the method of calculating available credit and a potential motive for under-reporting Ineligible Accounts Receivable when submitting BBC reports.

The defendant claims the warrant applications lacked a sufficient showing of probable cause because they failed to define what was meant by "material" discrepancies in Ineligible Accounts Receivables and "materially" inflated grain inventory values.  When reviewing a warrant application, the issuing judge is required to consider the applicable law and independently determine if the facts set forth in a warrant application support a finding of criminal activity.  Case law defines "material" in the context of bank fraud.  A false statement is material if it "had a natural tendency to influence or was capable of influencing the financial institution.  Materiality does not require proof that the financial institution actually relied on the statement."  United States v. Baker, 200 F.3d 558, 561 (8th Cir.2000) (citations omitted) (discussing materiality for purposes of making a false statement to the government in violation of 18 U.S.C § 1001).

In the context of the applicable law, based on a common sense review of the warrant applications, and without regard to any statements received from any FNBO collateral

examiner or Hergert Milling employee, (all of which supported rather than undermined the agents' review and interpretation of Hergert Milling's business documents), the facts gleaned from the Secret Service's  document review provided ample probable cause to believe criminal activity was afoot.  The warrant applications recited discrepancies between what the defendant reported in BBCs and the actual amount of Hergert Milling's Ineligible Accounts Receivable as determined by the Secret Service's review of the records, the amounts of which could influence a financial institution's decision to continue lending money.  The warrant applications provided probable cause to believe a search of Hergert Milling's records and premises would likely uncover evidence of bank fraud.  United States v. Britton, 9 F.3d 708, 709 (8th Cir.1993)("To prove a violation of § 1344, the government must show that defendants 'knowingly executed a scheme to defraud a federally insured bank.' . . .  The bank fraud statute condemns schemes designed to deceive in order to obtain something of value.")

B.    Unnamed FNBO Examiners/Unknown Reliability of Informants.

The defendant claims the warrant applications were lacking because they did not name the "FNBO Examiners" who described the discrepancies in the BBCs as "material," and did not provide any basis for finding the unnamed examiners "were credible or had given credible information in the past, with regard to any FNBO information reported to the Secret Service." The defendant also claims that when reviewing the warrant application, the court was not permitted to consider Special Agent Archer's reference to FNBO examiner statements that Accountant Samantha Valentine said she re-aged the Engleman Estate accounts at Mr. Hergert's direction.  He claims the alleged Samantha Valentine statements are double hearsay, and there was no indicia that Samantha Valentine was a reliable informant.

-11-

As the court has already explained, if all statements from FNBO examiners are removed from the warrant applications, and the court was left to rely solely on the warrant information obtained by the Secret Service's own review of the Hergert Milling business documents, probable cause would exist to issue the warrants. Moreover, when assessing the existence of probable cause, a law enforcement officer "may rely upon information received through an informant . . . so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." Gates, 462 U.S. at 241 (quoting Jones v. United States, 362 U.S. 257, 269 (1960)). Information provided to officers by an outside source can be supplemented and its reliability corroborated by independent law enforcement investigation. United States v. Warner, 894 F.2d 957, 959 (8th Cir. 1990). As applied to Samantha Valentine specifically, even when an informant has no prior record of providing information to the law enforcement, the information provided may be considered reliable if the statements were against her penal interest and agents were able to corroborate some of the information provided. United States v. Allen, 297 F.3d 790, 794 (8th Cir. 2002). Moreover, separate informants reporting substantially the same information may serve to corroborate each other. United States v. Jackson, 898 F.2d 79, 81 (8th Cir. 1990) (citing Warner, 894 F.2d at 960 (mutually corroborative tips supplied "substantial basis" for probable cause determination)).

The Secret Service Agents did not rely solely on the reports of the FNBO collateral examiners, but independently investigated the information and records received from FNBO. That investigation served to support the veracity of the collateral examiners' statements, as well as the reported statements of Samantha Valentine, who explained how she manually re-aged accounts receivable to make Ineligible Accounts appear as Eligible Accounts Receivable. The statements of Samantha Valentine and those of the FNBO examiners were cross-corroborated, and further corroborated by the Secret Service's investigation. To the extent the defendant claims the warrants were issued without probable cause because the

-12-

applications failed to name the FNBO examiners or provide information showing the examiners or Samantha Valentine were reliable sources of information, the defendant's arguments lack merit.

    C.    <u>Overbroad as to Time and Particularity</u>.

The defendant claims the warrants issued were overbroad.  Hergert argues:

> [A] sweepingly massive number of documents were ostensibly authorized to be searched and seized by the Search Warrants which documents had absolutely nothing to do with the criminal investigation. . . .  Moreover, the requested time period was grossly overbroad and lacks particularity in requesting documents "from January 2000 to the present [May 30, 2007]" or a period of seven years and five months.

Filing No. 60, p. 5.  In a footnote, the defendant explains: "We say 'ostensibly' authorized because our position is that, while a massive number of documents were seized, we believe the Affidavits willfully and recklessly misrepresented to the Magistrate Judge the nature and volume of the documents/things the agents intended to search and seize."  Filing No. 60, p. 5 n. 1.

The time frame of the search coincides with the age of the loan at issue.  Based on the evidence in the warrant application, the original loan actually dated back to 1995, but was replaced by a new loan in 2000.  Based on the agents' review of the Engleman account records alone, BBC discrepancies due to understated Ineligible Accounts Receivables dated back to as early as February 2001.  This finding, along with the length of the FNBO/Hergert Milling lending relationship itself, justified a search commencing at least as early as 2000 to determine the extent of defendant Hergert's alleged unlawful conduct and when it began.

The warrants authorized law enforcement to search and seize Hergert Milling's accounts receivables reports, invoices, purchase orders, or other billing documentation, checks, correspondence, and customer files for all customers of Hergert Milling, and Hergert Milling's bank statements, Borrowing Base Certificates, inventory evaluation reports, accounts payable or accounts receivable records, outstanding checks, telephone records, and correspondence between Hergert Milling and/or C. David Hergert and FNBO.  The warrant also authorized a complete search of all computer equipment for the purpose of finding the foregoing listed documents and items.

The description of documents to be searched was thorough, but upon consideration of the allegations at issue and the findings already uncovered by the agents' document review as set forth in the warrant applications, the description was not overbroad.  The agents were searching for evidence that defendant Hergert submitted materially false statements to an FDIC-insured bank as part of an unlawful scheme to deceive the bank.  As explained in the warrant applications, Hergert Milling's access to credit from FNBO was evaluated monthly, with the decision as to remaining available credit dependant on the information within the BBCs.  Determining the veracity of defendant's BBCs required evaluating the ongoing business transactions and inventory of Hergert Milling.  Although the Fourth Amendment requires a search warrant to describe with sufficient particularity the things to be seized in order to prevent a general, exploratory rummaging in a person's belongings, . . . . [t]he degree of specificity required in applying the particularity requirement is flexible and may vary depending on the circumstances and the types of items involved."  U.S. v. Kail, 804 F.2d 441, 445 (8th Cir. 1986)(quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)). As stated in Kail,

> For use involving a scheme to defraud, therefore, a search warrant is
> sufficiently particular in its description of the items to be seized if it is as

> specific as the circumstances and nature of activity under investigation permit. . . . While the search warrant in this case was broad in the sense that it allowed [agents] to seize almost all of the business records of [Hergert Milling], . . . under the particular facts of this case the scope of the warrant was justified. This is because it would not be possible through a more particular description to separate those business records that would be evidence of fraud from those that would not since there was probable cause to believe that fraud permeated the entire business operation.

Kail, 804 F.2d at 445 (holding a warrant to search a coin and stamp business suspected of mail fraud was not overbroad although it authorized inspectors to seize evidence of mailings of coins in bullion shipments; books, records, papers and documents relating to the sale and purchase of coins and bullion; accounting ledgers or records, checkbooks, monthly statements, cancelled checks, and deposit slips; inventory records, records of safety deposit boxes, safety deposit keys and coins; and  customer files, client lists, letters and mailings from clients, checks, cash, coins or bullion shipments sent as payment for purchases and advertising materials).  See also, U.S. v. Logan, 250 F.3d 350, 363 (6th Cir. 2001) (holding a warrant was broad but sufficiently particular where it authorized the seizure of items related to false or fraudulent activity regarding HUD/FHA co-insured loans and the GNMA mortgage-backed securities, including records, files, documents, notes, correspondence, microfiche, or computerized entries concerning HUD/FHA, GNMA, identity of mobile home dealers, borrowers both past and present, payment history and current loan status of borrowers, loan applications, and copies of submissions to FHA, GNMA, and HUD, FHA insurance claims, and other claims records, and authorized a search of all information or data stored by computer or electronic device to locate such information).

To the extent the defendant moves to  suppress evidence obtained from executing the warrants issued because the warrants were allegedly overbroad and lacked particularity, his motion should be denied.

Finally, even if the court assumes the warrant applications lacked probable cause, and the search parameters were overbroad and lacked sufficient particularity, under the good-faith exception set forth in United States v. Leon, 468 U.S. 897, 921 (1984), evidence seized pursuant to a search warrant issued by a judge will not be suppressed "if the executing officer's reliance upon the warrant was objectively reasonable."   Proell, 485 F.3d at 430. Under the facts presented, absent some showing that Franks v. Delaware, 438 U.S. 154 (1978), is applicable to this case, the Secret Service Agents were entitled to rely on the warrants issued by Judge Piester as authorizing their search.

### Motion for Hearing Under Franks v. Delaware
(Filing No. 61)

The defendant claims the warrant applications "contain intentional or reckless statements and intentionally and recklessly omitted relevant information."  He therefore claims the Leon good faith exception cannot be applied in this case, and he seeks an evidentiary hearing and suppression of evidence under Franks.  Specifically, the defendant claims the applications failed to disclose the breadth of documents and things the agents intended to search and seize, and the agents searched and seized a substantial amount of documents having nothing to do with their investigation.  In support of his argument, the defendant has offered the affidavit of Charlotte Herrell which states:

Charlotte Herrell was Hergert Milling's office manager from 2000 to the present, worked with Hergert Milling's Chief Financial Officer, Samantha Valentine, and supervised its bookkeepers.  Filing No. 62, Ex. 5 (Herrell affidavit), at CM/ECF p. 50, ¶ 5.  She was present at the Scottsbluff facility when Hergert Milling's facilities were searched on May 30, 2007.  Filing No. 62, Ex. 5 (Herrell affidavit), at CM/ECF p. 51, ¶ 7.

-16-

Ms. Herrell believes the agents exceeded the scope of any relevant computer search, explaining:

--   The Red Wing accounting system being used at the time was accessible on Hergert Milling's server, and Hergert Milling's previously used computer accounting program, Easy Systems, was on an old computer but not on the server. The Red Wing and Easy Systems computer programs stored information on Hergert Milling's accounts receivable, accounts payable, inventory, checking account, balance sheet, and profit and loss statements, but the programs also held accounting information regarding Power Trans/Tech, Inc. and U.S. Chicory, Inc. During the search, a Secret Service computer expert downloaded the Red Wing program from the server, and all accounting information from the Easy Systems program, which Ms. Herrell believes included Power Trans/Tech, Inc. and U.S. Chicory, Inc. information that has nothing to do with this case. Filing No. 62, Ex. 5 (Herrell affidavit), at CM/ECF p. 51, 54, ¶¶ 9, 17.

--   Ms. Herrell assumes the federal agents downloaded all computer information from both the new and old systems, which would include documents for not only Hergert Milling, but also Hergert Grain, H.M. Transportation, Highland Feed & Bean, Inc., David Hergert's personal business including cattle information, all financial records pertaining to the ranch and farming operations, Hergert Feeding Co. feedlot and Power TransTech, Inc., the great majority of which had nothing to do with Floyd Engleman, FNBO, or the matters described in the search

-17-

warrant applications and warrants. Filing No. 62, Ex. 5 (Herrell affidavit), at CM/ECF pp. 52-53, ¶ 10.

--      The federal agents downloaded information from David Hergert's personal laptop computer, which according to Ms. Herrell, contains no financial information or records for Hergert Milling.  She believes the agents downloaded information from the laptop on a presentation David Hergert gave to farmers regarding Power Trans/Tech center pivot irrigation.  Filing No. 62, Ex. 5 (Herrell affidavit), at CM/ECF p. 54, ¶¶ 15-16.

The agents also searched and, except where noted, seized the following paper documents which Ms. Herrell believes were not relevant to this case:

--      A box containing paperwork regarding cattle and feed matters between Dave Hergert personally and Floyd Engleman dba Engleman Farms. Filing No. 62, Ex. 5 (Herrell affidavit), at CM/ECF p. 51, ¶ 11.

--      12 to 15 boxes of older paid invoices of Hergert Milling dating back to 2000.  After examining the documents, the agents did not seize them. Filing No. 62, Ex. 5 (Herrell affidavit), at CM/ECF p. 51, ¶ 12.

--      A box with civil lawsuit files for cases between Gene Lay and David Hergert, and Mark Bramlett and David Hergert and others concerning cattle sales. Filing No. 62, Ex. 5 (Herrell affidavit), at CM/ECF p. 54, ¶ 18.

-18-

After the government left the premises, Ms. Herrell noticed someone had forced open a locked blue metal box containing David Hergert's social security card. Filing No. 62, Ex. 5 (Herrell affidavit), at CM/ECF p. 51, ¶ 13. The affidavit does not state Ms. Herrell saw the agents open the metal box, or that she knew the condition of the locked box or what it contained before the search began.

The defendant argues Charlotte Herrell's Affidavit describing what was actually searched and seized is evidence "the Agents willfully and recklessly misrepresented to the Magistrate Judge the nature, volume and kind of documents/things the agents intended to search and seize." Filing No. 60, p. 6. Under Franks, a defendant is not entitled to a hearing on his claim that the affiant officer intentionally or recklessly misstated or excluded material information from a warrant application unless he first shows that the warrant application, corrected to remove false information and to include concealed facts, would not have supported a finding of probable cause.   Franks, 438 U.S. at 170; United States v. Frazier, 280 F.3d 835, 845 (8th Cir. 2002).

Defendant Hergert claims Special Agent Archer's warrant application concealed the breadth of search anticipated, and the items the agents would seize, such that the warrant itself is invalid.   As previously discussed, the court authorized the breadth of search described in the warrant and the warrant was not overbroad or lacking in particularity.  The defendant has not shown that any statements within the warrant applications were untrue or that, as of the time the statements were made, the agents were concealing information from Judge Piester. The agents were authorized and ordered to search an expansive listing of business documents, and seize those documents evidencing criminal activity.  Although Ms. Herrell believes some of the documents seized were not relevant to the alleged criminal activity under investigation, her opinion is not controlling, persuasive, or evidence of the

-19-

agents' concealed intent to "overseize" information from Hergert Milling.  "The Fourth Amendment incorporates a great many specific protections against unreasonable searches and seizures, but it does not confer upon the person subject to a lawful search the right to decide for himself what will and what will not be seized."  U.S. v. Beusch, 596 F.2d 871, 876 (9th Cir. 1979).  Moreover, Ms. Herrell's affidavit does not state how or if she knew what was stored on defendant's personal laptop or within his metal lockbox, and therefore she cannot state what the agents allegedly seized from these locations, or that the information seized exceeded the scope of the warrant.

As the defendant acknowledges, the language of the warrants authorized a broad search encompassing voluminous documents.  While the defendant may believe or assume some of the information seized was not encompassed within the language of the warrant, "(1) sometimes the sorting out of the described items from intermingled undescribed items would take so long if performed at the scene that it is less intrusive merely to take that entire group of items to another location and do the sorting there; and (2) sometimes the sorting out must occur elsewhere because that action requires a degree of expertise beyond that of the executing officers."  LaFave, Search and Seizure, vol 2, § 4.11 (1996) (annotating cases).  Given the type of information being collected; Hergert's numerous corporate and business interests, with their records stored at the same location and with the same computer programs as Hergert Milling; the fact that Hergert Milling's corporate records were dispersed between various locations and stored in both electronic and paper formats; and the existence of Hergert Milling computer files on servers, older computers, and laptops, Ms. Herrell's description of the search does not evidence concealment of material facts  in submitting the warrant application.  Under the circumstances of this search, even if the agents seized some information outside the scope of the warrant during their search, such actions did not exceed the scope of the warrant or constitute an unreasonable search and seizure in violation of the Fourth Amendment.  See, e.g.,  United States v. Gleich, 397 F.3d 608 (8th Cir. 2005)

-20-

(holding the officers properly seized "three computers along with a number of computer diskettes" for later examination elsewhere); United States v. Horn, 187 F.3d 781 (8th Cir.1999) (holding officers did not "exceed the scope of the warrant by seizing Mr. Horn's video collection in its entirety for examination elsewhere" where police knew "individuals sometimes splice segments of child pornography into commercial tapes," and therefore each tape would need to be examined).

If the defendant presents no proof that the affiant lied or recklessly disregarded the truth, or concealed material facts, when submitting a warrant application, the court is not required to conduct a hearing.  Gleich, 397 F.3d at 613.  The defendant has not shown Special Agent Archer misstated or concealed any material facts.  A Franks hearing is not warranted, and defendant's motion to suppress should be denied.

### Motions to Dismiss
(Filing Nos. 48 and 50)

The defendant has filed a motion to dismiss, arguing the indictment is flawed because it fails to properly allege materiality and specific intent, and it accuses the defendant of bank fraud in a manner not sanctioned by the 18 U.S.C § 1344.  Filing No. 48, p. 1.  He also claims the indictment is multiplicitous, and therefore moves for dismissal or, in the alternative, for consolidation of the eighteen counts alleged.  Filing No. 50, p. 1.

A.    The Indictment.

The indictment against defendant Hergert alleges FNBO is a financial institution whose deposits are insured by the FDIC; Hergert Milling is a Nebraska corporation, with feed milling operations located in Scottsbluff, Gering, and Morrill, Nebraska; and Hergert Milling was wholly owned by defendant Hergert.  Filing No. 1, p. 1.  The indictment explains

FNBO was a creditor of Hergert Milling, with the debtor/creditor relationship defined and governed by a series of Loan and Security Agreements executed on or about January 31, 2000.  Filing No. 1, p. 1.  Consistent with the search warrant applications, the indictment describes: 1) the Loan Agreement between FNBO and Hergert Milling; 2) Hergert Milling's obligation to periodically provide Borrowing Base Certificates to FNBO; 3) the formula for calculating the Total Borrowing Base available using the value of Hergert Milling's Accounts Receivable, Grain Inventory, and Other Inventory, and 4) and the ability to increase the available revolving credit though material manipulation of asset values by increasing the reported Total Accounts Receivable, decreasing the reported Ineligible Accounts Receivable, and/or overstating the reported Grain Inventory value.  Filing No. 1, pp. 3-5.

After explaining the lending relationship and agreement between Hergert Milling and FNBO, the indictment alleges:

> From on or about January 31, 2000, to on or about December 14, 2006, CLARENCE DAVID HERGERT, knowingly executed and attempted to execute a scheme and artifice
>
>> (a)  to defraud First National Bank of Omaha, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation; and
>>
>> (b)  to obtain moneys, funds, credits, assets, securities, or other property owned by or under the custody or control of First National Bank of Omaha, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation by means of materially false and fraudulent pretenses, representations, and promises.

Filing No. 1, p. 5-6, ¶ 15.  The indictment explains Hergert directed employees to fraudulently and materially manipulate the value of Hergert Milling's Accounts Receivables, Grain Inventory and Other Inventory when preparing BBCs, and that defendant Hergert did

-22-

so to fraudulently and materially inflate the value of Hergert Milling's assets.  The indictment alleges:

> This fraudulent and material inflating of the asset values of Hergert Milling, Inc. on the monthly Borrowing Base Certificate submitted to FNBO, directed by CLARENCE DAVID HERGERT, had the effect of fraudulently and materially increasing the Total Borrowing Base availability listed on the Borrowing Base Certificate.  The fraudulent Borrowing Base Certificates, submitted by Hergert Milling, Inc., at the direction of CLARENCE DAVID HERGERT, falsely and materially misrepresented to FNBO the true financial condition of Hergert Milling, Inc. and deceived FNBO to believe that Hergert Milling, Inc. had asset values in excess of the Outstanding Loan Balance, pursuant to the terms of the Loan Agreements set forth above.  It was further part of the scheme and artifice that by submitting materially false and fraudulent Borrowing Base Certificates to FNBO, the defendant, CLARENCE DAVID HERGERT, made and caused to be made materially false and fraudulent misrepresentations for the purpose of maintaining the Loan Agreement with FNBO and prevented FNBO from discovering that Hergert Milling, Inc., in fact, did not have sufficient collateral to support the Outstanding Loan Balance, pursuant to the terms of the Loan Agreement.  Due to the fraudulent actions of CLARENCE DAVID HERGERT, FNBO was not able to take steps to protect its security and financial interests under the terms of the Loan Agreement

Filing No. 1, pp. 6-7, ¶ 16.

> Each separate count of the indictment alleges:

> CLARENCE DAVID HERGERT, knowingly executed and attempted to execute the scheme and artifice as set forth above, in that CLARENCE DAVID HERGERT, submitted and caused to be submitted to FNBO, a Borrowing Base Certificate, of Hergert Milling, Inc., which contained materially false and fraudulent misrepresentations regarding the eligible collateral used in determining continuing Borrowing Base Availability on the line of credit between FNBO and Hergert Milling, Inc., whereas, as CLARENCE DAVID HERGERT well knew, the information for eligible

-23-

collateral provided by Hergert Milling, Inc., which was contained on the Borrowing Base Certificate submitted to FNBO, was materially false and fraudulent.

The eighteen separate counts of the indictment allege the following separate and allegedly false Borrowing Base Certificates were submitted to FNBO by defendant Hergert:

Count I          BBC submitted on June 8, 2005;

Count II         BBC submitted on April 19,2001;

Count III        BBC submitted on May 17,2001;

Count IV         BBC submitted on July 27, 2001;

Count V          BBC submitted on February18, 2002;

Count VI         BBC submitted on June 17,2002;

Count VII        BBC submitted on July 3, 2002;

Count VIII       BBC submitted on  August 14, 2003;

Count IX         BBC submitted on November 7, 2003;

Count X          BBC submitted on August 19, 2004;

Count XI         BBC submitted on October 29,2004;

Count XII        BBC submitted on November 30, 2004;

Count XlII       BBC submitted on  December 22, 2004;

Count XIV        BBC submitted on August 12, 2005;

Count XV         BBC submitted on January 5, 2006;

Count XVI        duplicate of Count XV

Count XVII       BBC submitted on January 31, 2006;

Count XVIII BBC submitted on  December 14, 2006.

As to each count of the indictment, defendant Hergert was charged with violating 18 U.S.C. § 1344.

-24-

B.      Sufficiency of Allegations.

An indictment is sufficient if it includes the elements of the offense, provides adequate notice of the charge, and enables the defendant to plead double jeopardy as a bar to further prosecution.  Hamling v. United States, 418 U.S. 87 (1974);  U.S. v. Hayes, 574 F.3d 460, 472 (8th Cir. 2009); United States v. Hernandez, 299 F.3d 984, 992 (8th Cir. 2002); United States  v. Diaz-Diaz, 135 F.3d 572, 575-76 (8th Cir. 1998).  "An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted." Hernandez, 299 F.3d at 992.

18 U.S.C.A. § 1344 states:

Whoever knowingly executes, or attempts to execute, a scheme or artifice–

(1)     to defraud a financial institution; or

(2)     to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Paragraph 15 of the indictment  against defendant Hergert , which is included or incorporated by reference into each separate count of the indictment, directly mirrors the language of 18 U.S.C. § 1844.  "An indictment is normally sufficient if its language tracks the statutory language."  U.S. v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008).  Defendant Hergert claims, however, that the indictment is flawed and must be dismissed because it fails

to sufficiently allege materiality or specific intent, and alleges bank fraud in a manner not sanctioned by 18 U.S.C. § 1344.

Citing United States v. Staples, 435 F.3d 860 (8th Cir. 2006), the defendant argues the indictment is insufficient because it alleges 1344 (1) and (2) claims in the conjunctive sense, and therefore "the government cannot convict Hergert upon mere proof that Hergert misrepresented entries to a bank," but must prove "Hergert had a specific intent to make misrepresentations to a bank which were not only false but designed to expose the bank to a risk of actual loss—and which in fact exposed the bank to a real risk of loss."  Filing No. 49, p. 3.  The holding in Staples does not support the defendant's claim.

As explained in Staples, § 1344 (2), requires proof of some loss to the institution, or at least an attempt to cause a loss, while under § 1344(1), no actual loss or intent to cause a loss is required, so long as the defendant has defrauded a financial institution.  Staples, 435 F.3d at 867.  However, in Staples, the jury was instructed in the conjunctive, meaning a finding of guilt required finding the defendant violated both § 1344(1) and 1344(2).  Staples held that absent an objection by the government, the jury instructions became the law of the case.  Accordingly, since the case was charged to the jury in the conjunctive, the government was required to prove the elements of both § 1344(1) and (2), including actual loss or an attempt to cause a loss.

Although Hergert is indicted under both § 1344(1) and 1344(2), this fact does not warrant dismissal for failing to allege the bank "was exposed to a material risk of loss," (filing no. 49, p. 2 (emphasis in original)), or Hergert's misrepresentations "were intentionally aimed at creating a loss or a potential loss for the bank," (filing no. 49, p. 7). "[A]n indictment may be phrased in the conjunctive, when the statute and jury instructions

-26-

are phrased in the disjunctive, without creating a constructive amendment to the indictment." United States v. Spencer, 592. F.3d 866, 873-74 (8th Cir. 2010).

Hergert argues this case must be dismissed because the government cannot produce evidence that the bank changed its conduct or incurred any loss as a result of Hergert's alleged misrepresentations.  Under § 1344, "a defendant's deceptive course of conduct must be material and it must be directed at obtaining money or other property from the bank, but there is no requirement that it actually cause the bank to change its behavior.  A falsehood can be material even if it did not in fact induce the bank to alter its conduct, although if such alteration did occur it is obviously probative of materiality."  U.S. v. Pizano, 421 F.3d 707, 722 (8th Cir. 2005)(quoting U.S. v. Kenrick, 221 F.3d 19, 31 (1st Cir. 2000)).  Although the defendant argues any misrepresentations he made in BBCs were immaterial, and there is insufficient evidence to show the bank was deceived to its detriment, "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits.  The Fifth Amendment requires nothing more."  Costello v. U.S., 350 U.S. 359, 363 (1956).

In language that mirrors the statute itself, the grand jury indicted Hergert for violating 18 U.S.C. § 1344.  The indictment includes the elements of the federal crime of bank fraud, informs the defendant of the charge, and enables him to plead double jeopardy as a bar to further prosecution. The defendant's motion to dismiss for failure properly allege charges of bank fraud, and for failing to properly allege the elements of materiality and intent, should be denied.

C.   Multiplicity.

The defendant claims the indictment is multiplicitous.  He argues "[t]he fraud accusations against the Defendant allege that the Defendant misrepresented information regarding a single line of credit from a single bank (throughout various monthly reports)[, and], the eighteen counts should be consolidated into a single count of bank fraud.  Filing No. 51, p.1.  Absent consolidation, he argues the indictment must be dismissed.

An indictment which charges a single offense in multiple counts is multiplicitous. U.S. v. Rimell,  21 F.3d 281, 287 (8th Cir. 1994).  A multiplicitous indictment "is improper because it can lead to the imposition of multiple punishments for the same crime, violating the double jeopardy clause of the fifth amendment."  U.S. v. Jones, 403 F.3d 604, 606 (8th Cir. 2005).

Where bank fraud is alleged, each separate execution of a scheme to commit bank defraud may be alleged as a distinct count in the indictment.  Rimell, 21 F.3d at 287.  Hergert Milling's continued access to credit from FNBO was determined based on monthly reports defendant Hergert submitted to FNBO.  Each BBC submitted therefore served to define or re-define FNBO's lending responsibilities to Hergert Milling at that point in time, and each BBC containing false information to assure FNBO of Hergert Milling's continued collateral and solvency was a separate attempt to deceive the bank.

The indictment is not multiplicitous.  Defendant Hergert's "Motion to Dismiss Criminal Case or, in the Alternative to Consolidate Counts on the Grounds of Multiplicity," (filing no. 50), should be denied.

-28-

## Motion for Bill of Particulars
(Filing No. 46)

The defendant claims " the allegations in the Indictment are incomplete with regard to how the United States alleges Hergert committed the allegedly fraudulent acts." Filing No. 47, p.1. He therefore moves for a bill of particulars, claiming he is entitled to know the following:

      1.      Credit amounts which were allegedly lent and returned with regarding to each count of the Indictment;

      2.      Identities of employees who Hergert allegedly directed to fraudulently and materially manipulate values regarding each count of the Indictment;

      3.      The values and amounts of grain products which Hergert allegedly misrepresented regarding each count of the Indictment; and

      4.      The values and amounts of grain products which allegedly should have been provided to the First National Bank by Hergert or the directed employees mentioned above.

Filing No. 47, p. 3.

If a defendant believes that an indictment does not provide enough information to prepare a defense, then he or she may move for a bill of particulars. U.S. v. Livingstone, 576 F.3d 881, 883 (8th Cir. 2009) (citing Fed.R.Crim.P. 7(f)). "The purpose of a bill of particulars is to inform the defendant of the nature of a charge with 'sufficient precision to enable him to prepare for trial' and 'to avoid or minimize the danger of surprise at trial.'" Livingstone, 576 F.3d at 883. The bill of particulars also enables the defendant "to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment is too vague and indefinite." Hernandez, 299 F.3d at 989-90.

-29-

The government opposes the motion for bill of particulars, stating "Hergert has been provided with an 18-page Indictment which references the entire scheme to defraud the FNBO,". . . has been given extensive discovery materials provided by the United States and has taken a substantial period of time in order to review those documents."  Filing No. 63, pp. 4-5.  The government explains it has disclosed thousands of documents related to Hergert's alleged scheme and artifice to defraud, and has provided to the defendant witness statements and interviews regarding this case. The government claims that based on the information disclosed, the defendant knows the government's witnesses and the information they will provide, and has information regarding the values of the amount of grain and the credit amounts for his various loans with FNBO.

When, as in this case, the information requested by bill of particulars is already available to the defendant through evidence in his possession, the defendant received adequate notice of the charges and a full and fair opportunity to prepare a defense.  Under the circumstances described in the government's brief, defendant Hergert is not entitled to a bill of particulars.  Livingstone, 576 F.3d at 883 (denying the defendant's motion for bill of particulars where the government explained its theory of the case, and noted that it had already provided defendant with considerable discovery, including the names of its witnesses).

### Motion for Trial in North Platte
(Filing No. 52)

The defendant has moved to change the trial location from Lincoln to North Platte. He argues the defendant, and the vast majority of the witnesses and evidence are located in western Nebraska, and for the convenience of the witnesses and parties, the case should be transferred to North Platte.

Based on the information within the court's record, including the evidence submitted on defendant's motion to transfer, the defendant is from Torrington, Wyoming and works in Scottsbluff, Nebraska. Hergert Milling is located in Scottsbluff, Morrill, and Gering, Nebraska. Defendant Hergert believes witnesses familiar with the business and operations of the grain and milling industry of western Nebraska, all or most of whom dwell the far western reaches of Nebraska or eastern Wyoming, will testify at trial. Those named by the defendant include ten trial witnesses from Scottsbluff, Nebraska; four from Morrill, Nebraska; three from Mitchell, Nebraska; two from Gering, Nebraska; a witness from Henry, Nebraska; and a witness from Douglas, Wyoming. All of the named witnesses are residents of Scotts Bluff County, Nebraska or of counties in eastern Wyoming adjacent to Nebraska. The documents and records of Hergert Milling are located in Scottsbluff, Nebraska. Filing No. 54, at CM/ECF pp. 4-6, ¶¶ 9, 10, & 14. Defendant Hergert's evidence verifies that Scottsbluff is approximately 195 miles from North Platte, compared to 420 miles from Lincoln. Therefore, the defendant states a trial in Lincoln will be costly to the defendant and the trial witnesses in terms of travel time, fuel costs, overnight stays at the trial location, and time away from work. Filing No. 54, at CM/ECF pp. 4, 6, ¶¶ 7, 11 & 12.

Defendant's expert, who obtained his master's degree education in Rhode Island, has a Ph.D. in Sociology from the University of Nevada, Las Vegas, is a resident of Livingston, Montana, and currently teaches at the New York Institute of Technology in Old Westbury, New York, opines there "are significant differences between the average potential juror drawn from central or western Nebraska compared to the average juror drawn from eastern Nebraska." Filing No. 54, CM/ECF p. 6, ¶ 14. He explains these differences arise from the eastern urban compared to the western rural culture, with eastern agriculture focusing on high yield crop production compared to western cattle ranching, livestock feedlots, or dryland or irrigated grain production. Defendant's expert states the economic differences between eastern and western Nebraska results in significant differences in ideology and culture, with

western Nebraskans adopting a cowboy culture and eastern Nebraskans a midwestern culture. He concludes:

> These differences are also reflected in general dispositions regarding the western grain milling business, and in greater general knowledge among western Nebraskans of feed grain milling operations and business culture in western Nebraska, which is the focus of this case.
>
> . . .
>
> The Defendant, David Hergert, is substantially more likely to receive a fair trial in North Platte before a jury of western Nebraskans than he would be in Lincoln or Omaha before a jury of eastern Nebraskans, whom would not identify as strongly with Hergert and his business.

Filing No. 54, p. 7-8, ¶¶ 18, 20.

The government opposes changing the trial location, arguing FNBO is a national banking association with its principal offices in Omaha, Nebraska; defendant Hergert maintained a lending relationship with FNBO; various decisions regarding the ongoing revolving loan occurred in Omaha; and numerous witnesses from Omaha and vendors from throughout Nebraska will testify at trial. The government notes the defendant will travel and stay overnight during trial irrespective of whether the trial is held in Lincoln or North Platte. The government adds there is no U.S. Attorneys Office in North Platte, and the North Platte trial location is not staffed with court personnel. Court staff, security, and Marshals will need to come from Lincoln or Omaha to North Platte if the trial is moved. The government further states the ruling on defendant's pretrial motions, which were fully submitted on December 22, 2010, will likely come too late to afford a North Platte trial in February of 2011–the month Judge Kopf is scheduled to try cases in North Platte for 2011.

The court further notes defendant's retained counsel is from Omaha, and the government's counsel is from Lincoln.   The court and counsel do not foresee any security concerns arising from trying this case in North Platte instead of Lincoln.

Under Rule 18 of the Federal Rules of Criminal Procedure:

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.  The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

Fed. Crim. P. 18.   In the context of the allegations against defendant Hergert, the "location of the offense" is ambiguous.   The alleged re-aging of accounts receivables and creation of BBCs with  false representations of Ineligible Accounts Receivables and Grain Inventory occurred in western Nebraska; the false statements were allegedly delivered with intent to deceive to FNBO in eastern Nebraska.   Under 18 U.S.C.A. § 3237, "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."   By analogy, an offense which began in western Nebraska, but completed in eastern Nebraska, can be properly tried in either a western or eastern Nebraska trial location.

The defendant resides in eastern Wyoming and works in western Nebraska.   The alleged victim of his crime, FNBO, is headquartered in Omaha, but has locations in several states, and locations throughout Nebraska.   Unlike an individual victim, FNBO likely anticipates litigation and defending its interests in forums distant from its Omaha headquarters.   Moreover, FNBO has three branch locations in North Platte, and to the extent

witnesses from FNBO need to attend trial, they would likely have some access to a work site while waiting to testify.

The defendant has identified, by name and residence city, twenty-one trial witnesses who reside in western Nebraska or eastern Wyoming.  These witnesses reside close enough to North Platte to reasonably drive there and back to home in a day.  If the defendant needs additional documents from Scottsbluff, Morrill, or Gering for use at trial, they can be delivered fairly quickly, mostly likely within the trial day.  Based on the evidence before the court, a North Platte trial will be more convenient for the witnesses and the defendant.

The government argues changing the trial location to North Platte will hinder the prompt administration of justice.

> [T]he necessity of the administration of justice is also a consideration in this case. Currently, trial is scheduled in February, 2011, however, the defendant has filed numerous motions which may necessitate hearings before this Court. If those hearings occur, trial will be delayed until at least May if trial is held in North Platte.  If trial is continued in Lincoln, and hearings are necessitated, the trial may be held much quicker than a trial in North Platte.  The government respectfully requests that this administration of justice concern be addressed in any determination on a change of venue.

Filing No. 63, p. 3. This recommendation addresses the government's concerns with the impact of trial delay on the administration of justice.

Based on all the foregoing discussion within this recommendation, the undersigned magistrate judge concludes a hearing is not warranted on defendant's motion to suppress or for a <u>Franks</u> hearing, and this recommendation will be filed more than a month before the scheduled commencement of trial.  The issue of Judge Kopf's North Platte trial calendar and a February trial setting was first addressed during a conference with the parties on August

9, 2010.  Several continuances of pretrial motion filing and response deadlines were requested and granted, but the parties were reminded more than once that a February trial setting in North Platte would be jeopardized if pretrial motions were further delayed.

The recommendation on those motions is now filed.  If the parties promptly file and brief their objections, if any, to this recommendation, the case need not be delayed beyond February.

Upon balancing the factors to be considered, for the convenience of the defendant and witnesses, and in accordance with Rule 18 of the Federal Rules of Criminal Procedure, the case will to transferred to the North Platte trial docket.  See U.S. v. Stanko, 528 F.3d 581 (8th Cir. 2008).

For all the foregoing reasons,

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Court Judge, that:

1)      The defendant's Motion to Suppress (filing no. 59), and Motion for Hearing Under Franks v. Delaware, (filing no. 61), be denied; and

2)      The defendant's Motion to Dismiss Criminal Case (filing no. 48), and Motion to Dismiss Criminal Case or, in the Alternative to Consolidate Counts on the Grounds of Multiplicity (filing no. 50), be denied.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

IT IS ORDERED:

1)      The defendant's Motion for Bill of Particulars, (filing no. 46), is denied.

2)      The defendant's  Motion to Change Venue and Vicinage in North Platte, (filing no. 52), is granted.  The trial of this case remains set to commence on February 7, 2011.  The location of trial is North Platte, Nebraska.

DATED this 30th day of December, 2010.


                        BY THE COURT:

                        _s/ Cheryl R. Zwart_____
                        United States Magistrate Judge

---

        *This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.